UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

v.

(1) Jerry A. Reyes,
    a/k/a "Otto Reyes,"

        Defendant.

No. 13-cr-70(1) (JRT/LIB)

**REPORT AND RECOMMENDATION**

This matter came before the undersigned United States Magistrate Judge upon

Defendant's Motion to Dismiss, [Docket No. 118]; his Motion for Suppression of Evidence

Obtained as a Result of Search and Seizure, [Docket No. 93]; and his Motion for Suppression of

Admissions or Confessions, [Docket No. 96].  The case has been referred to the Magistrate Judge

for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1.  The

Court held a hearing on July 2, 2013, regarding the Defendants' motions for discovery,[1]

severance,[2] dismissal, and suppression.  For reasons outlined below, the Court recommends the

motions be **DENIED**.

I.      **BACKGROUND**

Jerry A. Reyes, a/k/a "Otto Reyes" ("Defendant") is an enrolled member of the Leech

Lake Band of Chippewa Indians, and is one of four persons charged with one count each of

Transportation, Sale and Purchas of Fish Taken in Violation of Tribal Law, in violation of 16

U.S.C. §§ 3372(a)(1) and 3373(d)(1), and Leech Lake Band of Chippewa Indians Conservation

Code §§ 22.01(2) and 23.01.  (Indictment [Docket No. 1] at 2-4).  Defendant was indicted on

---

[1] Defendant's discovery motions were the subject of a separate Order.  [Docket No. 135].
[2] Defendant's motion for severance was the subject of a separate Order.  [Docket No. 145].

April 9, 2013, and made the present motions on June 20, 2013. The Court held an evidentiary hearing on July 2, 2013, and accepted evidence concerning the suppression motions; the parties were allowed additional time for briefing, and both Defendant and the Government provided supplemental briefs. (See Docket Nos. 141-42). Defendant is presently scheduled to go to trial before the Hon. John R. Tunheim on September 23, 2013. (See Order [Docket No. 131]).

## II.  DEFENDANT'S MOTION TO DISMISS [Docket No. 118]

Defendant Reyes was indicted as part of "Operation Squarehook," a collaborative effort among officials of the Federal Government, the Leech Lake Band of Chippewa Indians, the Red Lake Band of Chippewa Indians, and the State of Minnesota to investigate and prosecute illegal poaching and marketing of protected fish on the Leech Lake and Red Lake Reservations and in Beltrami, Cass, Clearwater, Itasca, Pennington, and Polk Counties.[3] Defendant Reyes is one of ten persons who were indicted in four separate Federal cases: United States v. Brown, No. 13-cr-68 (JRT/LIB); United States v. Reyes, No. 13-cr-70 (JRT/LIB); United States v. Bellefy, 13-cr-71 (RHK/LIB); and United States v. Good, 13-cr-71 (JRT/LIB) (collectively, the "Federal prosecutions").[4]

---

[3] The Court takes judicial notice of the co-operative nature of the investigation among Federal, Tribal, and State agencies. See Press Release, U.S. Attorney's Office, District of Minnesota, Ten Indicted In Connection With Illegal Poaching of Walleye On Leech Lake And Red Lake (April 10, 2013), available at http://www.justice.gov/usao/mn/bellefy,etc.indicted html (last viewed Aug. 7, 2013).

[4] In United States v. Brown, Defendant Michael D. Brown is identified in the Indictment as an enrolled member of the Leech Lake Band of Chippewa Indians; the Indictment does not indicate whether Defendant Michael J. Nei is an Indian.

In United States v. Reyes, Defendants Jerry A. Reyes, a/k/a/ "Otto Reyes," and Marc L. Lyons are identified in the Indictment as enrolled members of the Leech Lake Band of Chippewa Indians, and Defendant Frederick W. Tibbetts, a/k/a "Bud Tibbetts," is identified in the Indictment as an enrolled member of the White Earth Band of Chippewa Indians; the Indictment does not indicate whether Defendant Alan D. Hemme is an Indian.

The Indictment in United States v. Bellefy does not indicate whether Defendants Larry W. Bellefy, Thomas P. Sumner, or Brian Holthusen are Indians; however, Defendants Sumner and Holthusen identify themselves as enrolled members of the Red Lake Band of Chippewa Indians in their respective motions to dismiss for selective prosecution.

The Indictment in United States v. Good does not indicate whether Defendant Larry Good is an Indian; however, he identifies himself as an enrolled member of the Red Lake Band of Chippewa Indians in his motion to dismiss for selective prosecution.

Defendant here first argues that the Lacey Act does not apply to Indians.  In the alternative, Defendant argues that, even if the Lacey Act applies to Indians, the Government's prosecution of him under the Lacey Act is invalid because the acts that the Indictment alleges he committed, even if true, would merely constitute the lawful exercise of his rights under the Treaty with the Chippewa, 7 Stat. 536 (July 29, 1837) (hereinafter, the "1837 Treaty"), and various other treaties.  (See Docket No. 118).[5]

## A.  The Lacey Act applies to Indians.

Defendant argues that Congress never intended the Lacey Act to apply to Indians.  The Court cannot agree with this argument, which is clearly contrary both to the plain language of the Lacey Act and to binding Eighth Circuit precedent.  United States v. Big Eagle, 881 F.2d 539, 540 n.1 (8th Cir. 1989) (hereinafter "Big Eagle II") ("the Lacey Act, by its terms and definitions, applies to Indian people" (citing 16 U.S.C. § 3371(e) ("The term 'person' includes any individual . . . subject to the jurisdiction of the United States")).  The Eighth Circuit's holding in Big Eagle II is consistent with the Ninth Circuit's decision in United States v. Sohappy. 770 F.2d 816 (9th Cir. 1985).  Upon a review of the Lacey Act's legislative history, the Ninth Circuit held that Congress intended that the act apply to Indians:

> [T]he overall purpose in subjecting persons who traffic in illegally obtained fish to the stiffer Lacey Act penalties was to allow the Federal Government to provide more adequate support for the full range of laws that protect wildlife.
> Indians who traffic in illegal wildlife harm the Lacey Act's goal of wildlife preservation just as much as non-Indian traffickers.  . . .  To exempt Indians from these penalties would impede attainment of Congress' goal.

---

[5] Seven of the ten defendants in the Federal prosecutions have moved for dismissal of the Indictment on the grounds that they were merely exercising their treaty rights, and at least some have sought to incorporate each other's arguments with regard to these motions.  (See, e.g., United States v. Brown, No. 13-cr-68(1), Def.'s Supplementary Mem. Supp. Mot. Dismiss Indictment [Docket No. 69], at 1 ("We respectfully . . . join in the arguments filed on behalf of the Red Lake and Whtie Earth defendants in the 'Operation Squarehook' cases.").

Consequently, references in this Report and Recommendation to Defendant's arguments encompass not only those made by Defendant in the present case, but also to those made by defendants in the related cases.

Id. at 821 (internal quotations, alternations, and citations to Congressional reports omitted).[6] Defendant offers no authority—in particular, no binding Eighth Circuit or U.S. Supreme Court authority—to suggest that the Lacey Act does not apply to Indians.  Therefore, the Court holds, consistent with Big Eagle II, that the Lacey Act does apply to Indians, and, consequently, that the Indictment is not facially improper.

**B.  The Government's prosecution of Defendant under the Lacey Act does not violate his treaty fishing rights.**

Having determined that the Lacey Act applies to Indians, the Court next must determine whether the Government's prosecution of Defendant under the Lacey Act is improper as a punishment for the exercise of his right to fish, as guaranteed by treaties.

**1.  Standard of Review**

"A prosecution designed solely to punish a defendant for exercising a valid legal right violates due process."  United States v. Leathers, 354 F.3d 955, 961 (8th Cir. 2004) (citing Blackledge v. Perry, 417 U.S. 21, 25-26 (1974); United States v. Graham, 323 F.3d 603, 606 (8th Cir. 2003)).  A defendant may demonstrate that he was prosecuted for an improper motive by either direct or circumstantial evidence.  Id. (citing United States v. Beede, 974 F.2d 948, 951 (8th Cir. 1992)).  However, "[i]t is the defendant's burden to show that the prosecution was brought in order to punish the defendant for the exercise of a legal right."  Id. (citing United States v. Kriens, 270 F.3d 597, 602 (8th Cir. 2001)).  The Eighth Circuit has repeatedly described the Defendant's evidentiary burden in proving an improper motive for prosecution as "a heavy one."  Id. (citing United States v. Kelley, 152 F.3d 881, 885-86 (8th Cir. 1998)).

---

[6] See also United States v. Big Eagle, 684 F. Supp. 241, 244 (D.S.D. 1988) ("The defendant next contends that the Court lacks subject matter jurisdiction to hear this action because the Lacey Act does not apply to Indians.  The only United States Court of Appeals to decide this issue has held that the Lacey Act does apply to Indians.  This Court is persuaded that the decision of the Ninth Circuit in United States v. Sohappy is correct and that the discussion of the issues raised in Sohappy is dispositive for purposes of deciding this motion" (citations omitted).).

### 2. Discussion

The Court begins with the issues that are not in dispute. First, in the present case, neither party disputes that the Chippewa Indians[7] in Minnesota generally have a right to fish on tribal land and within the territory ceded pursuant to the 1837 Treaty. "As a general rule, Indian tribes have 'the power to manage the use of their territory and resources both by members and nonmembers.'" United States v. Big Eagle, 684 F. Supp. 241, 245 (D.S.D. 1988) (hereinafter "Big Eagle I") (citing New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 335 (1983), aff'd Big Eagle II, 881 F.2d 539 (8th Cir. 1989), reh'g denied 1989 U.S. App. LEXIS 13872 (8th Cir. Sept. 8, 1989) (en banc), cert. denied 493 U.S. 1084 (1990). "Although some treaties provide expressly that Indians have exclusive hunting, fishing, and gathering rights on their reservations, it is not necessary that the rights be referred to as "exclusive" in the treaty, or even that they be expressly mentioned. Exclusive on-reservation hunting, fishing, and gathering rights are implied from the establishment of a reservation for the exclusive use of a tribe, whether the reservation was set aside by executive order, statute, agreement, or treaty." 1-18 Cohen's Handbook of Federal Indian Law § 18.03 (footnotes omitted). "Such treaty rights can be asserted by . . . an individual member of the Tribe." United States v. Dion, 476 U.S. 734, 738 n.4 (1986).

Additionally, although Defendant Reyes argues that his prosecution under the Lacey Act is a violation of his treaty rights, Defendant *does not challenge* the Leech Lake Conservation Code sections that constitute the predicate offenses for his Lacey Act prosecution, nor does he challenge the application of those Code sections to him. In fact, Defendant expressly acknowledges tribal authority to regulate fishing within its territorial jurisdiction. (Mot. Dismiss Indictment [Docket No.118], at 1 ("It is the position of the Defendant that tribal members and residents have the right to catch fish *consistent with* past treaties and *the Leech Lake Code of*

---

[7] Also known as Ojibwe or Anishinabe.

*Conduct.* Further, it is the Defendant's position that *any alleged violation of the Code of Conduct should be prosecuted by the Leech Lake Band of Chippewa Indians*" (emphasis added).).

Finally, in the present case neither party disputes that the Lacey Act is a Federal statute of general applicability. Both Defendant and the Government acknowledge that "'federal laws of general applicability 'are applicable to the Indian unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question.'" United States v. Wadena, 152 F.3d 831, 846 (8th Cir. 1998) (quoting Sohappy, 770 F.2d at 819 (9th Cir. 1985) (quoting, in turn, United States v. Burns, 529 F.2d 114, 117 (9th Cir. 1975))). If a court determines that there is a treaty right that exempts Indians from the operation of a Federal statute of general applicability, the court next asks whether that treaty right was abrogated by Congress. A court generally will find that Congress has abrogated a treaty right only where there is explicit statutory language doing so. Dion, 476 U.S. at 738-39 (collecting cases).

The first question, then, is not, as Defendant urges, whether the Lacey Act abrogates his treaty right to take fish on the Leech Lake Reservation—a right that the Government acknowledges Defendant has. Rather, the Court must begin with this question: Does Defendant's treaty right exempt him from the operation of the Lacey Act?

      **a. The case law, both in the Eighth Circuit and elsewhere, supports the Government's assertion that Defendant's treaty right to fish does not exempt him from operation of the Lacey Act.**

          **i. Sohappy and Stone**

The Ninth Circuit, in Sohappy, was the first court to address this question in detail, and it found that the defendants' treaty rights *did not* exempt them from the operation of the Lacey Act. 770 F.2d at 820. The defendants in Sohappy were convicted of violating the Lacey Act by

catching and selling fish in violation of tribal and state law.  Id. at 817.  They appealed, arguing

"that federal prosecution of Indians for violations of tribal fishing law violates Indian

sovereignty and Indian treaty reserved fishing rights."  Id.

      The Ninth Circuit rejected those arguments.  With regard to the argument that a Lacey

Act prosecution would violate Indian tribal sovereignty, the court held that "Indian sovereignty is

necessarily limited and must not conflict with the overriding sovereignty of the United States."

Id. at 819 (internal citation and quotation omitted).  Additionally, the court held that a Lacey Act

prosecution does not impair Indian tribal sovereignty, but rather "supports tribal laws by

authorizing federal penalties for violations."  Id. at 819-20.  Furthermore, it held that a Lacey Act

prosecution does not violate reserved fishing rights because "the Indians do *not* have any treaty

reserved right to exercise *exclusive* jurisdiction over such fishing matters.  Nor is there "specific

language [in the treaties] . . . 'purporting to exempt Indians from the laws of general applicability

throughout the United States.'"  Id. at 820 (quoting Burns, 529 F.2d at 117 (emphasis and

alterations in Sohappy).

      The Eighth Circuit expressly adopted this reasoning, albeit not in a Lacey Act case, in

United States v. Stone. 112 F.3d 971 (8th Cir. 1997).  In Stone, the defendant, an enrolled

member of the White Earth Band of Chippewa Indians, was convicted of violating the Airborne

Hunting Act[8] on the White Earth Indian Reservation.  112 F.3d at 972.  He appealed, arguing in

part that "the treaties between the Chippewa Indians and the United States vested the tribes with

jurisdiction over hunting, fishing and wild rice gathering and that therefore he cannot be

federally prosecuted for hunting on the reservation."  Id. at 973.  The Eighth Circuit, citing

Sohappy with approval, rejected this argument:

---

[8] 16 U.S.C. § 742j-l.

As the Ninth Circuit pointed out, however, despite the fishing rights contained in a treaty, "Indians do not have any treaty reserved right to exercise exclusive jurisdiction over such fishing matters." <u>United States v. Sohappy</u>, 770 F.2d 816, 820 (9th Cir. 1985) (upholding federal jurisdiction over an Indian on the reservation under federal statute criminalizing transporting, selling, or acquiring fish). "Indian sovereignty is 'necessarily limited' and must not conflict with the overriding sovereignty of the United States." <u>Id.</u> at 819. Federal laws of general applicability "are applicable to the Indian unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question." <u>Burns</u>, 529 F.2d at 117; <u>Sohappy</u>, 770 F.2d at 820 (quoting <u>Burns</u>, 529 F.2d at 117). . . . [A]s in <u>Sohappy</u>, federal jurisdiction under the Airborne Hunting Act is not "disruptive of tribal authority, for rather than overturning basic tribal regulations, it supports the tribal laws by authorizing federal penalties for violations," and its enforcement against an Indian on Indian land is proper. <u>Id.</u> at 819-20.

<u>Stone</u>, 112 F.3d at 973-74.

Defendant argues that neither <u>Sohappy</u> nor <u>Stone</u> controls the present case. First, Defendant argues that <u>Sohappy</u> is inapplicable, because the treaty at issue in that case provided for a tribal "right to take fish at all 'usual and accustomed places' [which] was not exclusive but was to be shared 'in common with the citizens of the Territory.'" 770 F.2d at 819. In contrast, Defendant argues that the Chippewa Indians retain exclusive fishing rights on their reservations. Defendant misses the point. The issue described by the court in <u>Sohappy</u> was whether the treaty reserved exclusivity as to "*jurisdiction over enforcement* of tribal fishing law against Indians." 770 F.2d at 818. Defendant has provided no evidence of any treaty language, or any other authority, that reserves to the Chippewa Indians exclusive jurisdiction—to the exclusion of the United States—over enforcement of on-reservation fishing regulations.

Defendant also argues <u>Stone</u> is inapplicable because it did not concern fishing rights. The Court is not persuaded. Although Stone was prosecuted for a hunting violation and not a fishing violation, the defendant's argument in that case was substantially the same as the Defendant's argument in the present case: that his Federal prosecution violated the usufructuary

rights he was guaranteed by one or more treaties. Defendant offers no reason, and the Court can think of none, that the distinction between hunting and fishing would be material.

### ii. __Big Eagle I__ and __II__.

Three years after the Ninth Circuit decided <u>Sohappy</u>, the U.S. District Court for the District of South Dakota denied a motion to dismiss that raised substantially the same questions at issue in the present case. In <u>Big Eagle I</u>, the defendant was an enrolled member of the Crow Creek Sioux Tribe, and was charged with a Lacey Act violation, the predicate offense being a violation of the fishing regulations contained in the Lower Brule Sioux Tribe's Wildlife Management Code. 684 F. Supp. at 242-43. The defendant argued that the Fort Laramie Treaty of 1868, 15 Stat. 635 (Apr. 29, 1968), guaranteed him a right to fish where he did. 684 F. Supp. at 244. The court concluded that the exercise of such a right could be regulated either by lawfully enacted tribal regulation, or by its explicit abrogation under Federal law. <u>Id.</u> at 246 ("Neither the Lacey Act nor the Lower Brule Wildlife Management Code 'takes away the rights of Indians to fish in the Missouri River,' as the defendant argues. Rather, Indians retain the right to fish in accordance with tribal regulations except as these rights may be expressly abrogated by federal law.").

Upon a review of various Sioux treaties, the Court concluded that those treaties "may be construed to authorize regulation of fishing by the Indians within each reservation," and that various Sioux tribes (including the Lower Brule) had enacted "their own fishing regulations. <u>Id.</u> at 245. Because the Lower Brule Sioux Tribe had enacted regulations governing the exercise of treaty rights within the Lower Brule Reservation, and because those regulations governed the defendant's actions, and because the defendant's violation of those regulations precipitated his

prosecution under the Lacey Act, that prosecution did not constitute a *Federal* abrogation of his treaty rights.  Id. at 244-46.[9]

### iii. Defendant presents <u>no</u> case law in which a court has held that an Indian's treaty rights exempt him from operation of the Lacey Act.

Defendant presents no authority, and this Court has found none, holding that an Indian's treaty rights exempt him from operation of the Lacey Act.  Instead, Defendant relies on cases that only generally address tribal usufructuary rights and cases holding that certain Federal prosecutions under acts other than the Lacey Act abrogated Indian treaty rights.

Defendant does not specifically address the rationale of <u>Big Eagle I</u>, but instead argues that <u>Sohappy</u>, <u>Stone</u>, and <u>Big Eagle</u> (presumably both <u>I</u> and <u>II</u>) were effectively reversed by the U.S. Supreme Court's decision in <u>Minnesota v. Mille Lacs Band of Chippewa Indians</u>, 526 U.S. 172 (1999).  However, <u>Mille Lacs</u> has no bearing on the present case, for two reasons: First, <u>Mille Lacs</u> did not, as Defendant suggests, expand the Indians' *on-reservation* usufructuary rights that were addressed in <u>Stone</u>, but instead confirmed that the Chippewa Indians reserved rights to hunt, fish, and gather *off-reservation* in the "ceded territory."  526 U.S. at 204. Defendant is charged with an on-reservation offense.[10]  Thus, <u>Mille Lacs</u> does not apply.

Second, <u>Mille Lacs</u> held that treaties limited the *State's* authority to infringe Chippewa Indians' usufructuary rights—it says nothing about the *Federal Government's* authority to prosecute pursuant to a law of general applicability:

> [T]he 1837 Treaty gave the Chippewa the right to hunt, fish, and gather in the ceded territory *free of territorial, and later state, regulation*, a privilege that others did not enjoy.  Today, *this freedom from state regulation curtails the*

---

[9] Although the Eighth Circuit did not specifically address this argument in <u>Big Eagle II</u>, it did affirm the District Court's denial of the defendant's motion to dismiss.

[10] The Indictment alleges that Defendant violated the Leech Lake Conservation Code; thus, he is charged under the Lacey Act for an alleged violation of "Indian tribal law."  <u>See</u> 16 U.S.C. § 3372(a)(1).  The Lacey Act "Indian tribal law" provision applies only to conduct "within Indian country defined in section 1151 of title 18."  16 U.S.C. § 3371(c).

> *State's ability to regulate hunting, fishing, and gathering by the Chippewa in the ceded lands*.

Id. (emphasis added). "The federal government can regulate fishing concurrently with the Indian tribes in the interest of conservation." Big Eagle, 684 F. Supp. at 244 (citing Sohappy, 770 F. Supp. at 819); see also Stone, 112 F.3d at 973-74.

Defendant also urges the Court to follow United States v. White, 508 F.2d 453 (8th Cir. 1974). In White, the defendant, a member of the Red Lake Band of Chippewa Indians, was seen shooting a bald eagle on the Red Lake Indian Reservation, and was charged with unlawful taking under the Bald and Golden Eagle Protection Act (the "BGEPA"), 16 U.S.C. § 668(a). White, 508 F.2d at 454. The District Court dismissed on the grounds that the defendant was legally exercising his treaty guaranteed right to hunt on the reservation, and the Eighth Circuit affirmed on the same grounds. Id. at 454, 457. In particular, the Eighth Circuit held that Congress, in enacting the BGEPA, had not explicitly abrogated Indian treaty rights to hunt eagles and, therefore, that Defendant was legally exercising his hunting right.

However, prosecution under the BGEPA, unlike the Lacey Act, is not premised upon a predicate violation of a tribal wildlife law. Thus, in White the court was presented only with the question of whether the BGEPA abrogated the defendant's treaty right.

In the present case, the Court need not reach the question of whether Defendant's treaty right to fish was abrogated by the Lacey Act, because the Court finds that the Leech Lake Band's Conservation Code legitimately limits the scope of this right, such that Defendant's right to fish does not excuse him from the operation of the Lacey Act. See Wadena, 152 F.3d at 846 (Federal statute of general applicability applies to Indians unless treaty right *excuses them from operation of the statute*, or the right has been explicitly abrogated).

### b. Summary

"Tribal wildlife laws are *per se* valid against tribe members."  United States v. Williams, 898 F.2d 727, 729 (9th Cir. 1990); see also Big Eagle I, 684 F. Supp. at 244-46.  In fact, Defendant does not challenge the authority of the Leech Lake Band's Conservation Code.  Thus, it is the Conservation Code that specifies how Defendant may exercise his right to fish.  Additionally, "the exercise of federal jurisdiction under the Lacey Act . . . supports tribal laws by authorizing federal penalties for violations."  Sohappy, 770 F.2d at 819-20; see also Big Eagle I, 684 F. Supp. at 244 ("[t]he federal government can regulate fishing concurrently with the Indian tribes in the interest of conservation").[11]  Defendant's attempts to distinguish Sohappy, Stone, and Big Eagle are unavailing.  Therefore, applying the reasoning in those cases, the Court finds that although Defendant generally has a right to fish guaranteed by the various Chippewa Indian treaties, that right is (1) subject to lawful regulation by the Chippewa Indian tribes, and (2) the Federal Government has concurrent jurisdiction with regard to enforcement of tribal wildlife regulations affecting that right.

Accordingly, Defendant's treaty right does not exempt him from the operation of the Lacey Act and its incorporation of tribal wildlife law.  Because Defendant's treaty right does not

---

[11] Defendant argues that, under United States v. Jackson, 600 F.2d 1283 (9th Cir. 1979), the federal government lacks the authority to prosecute a violation of a tribal wildlife ordinance.  However, Jackson is easily distinguished from the present case, as the nature of the federal statute at issue in Jackson is very different from the Lacey Act.  In Jackson, the prosecution was brought under 18 U.S.C. § 1165, "which provides:

> Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any . . . Indian tribe, . . . for the purpose of hunting, . . . shall be fined not more than $200 or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited.

Jackson, 600 F.2d at 1284 (quoting 18 U.S.C. § 1165).  Thus, in Jackson, the defendant, who was an enrolled member of the Confederated Tribes of the Umatilla Reservation, was in essence charged with a trespass upon Indian land—an Indian-on-Indian crime.  The Jackson court held that "in the absence of an explicit Congressional directive, Indian tribes have exclusive criminal jurisdiction over offenses committed by one Indian against another Indian."  600 F.2d at 1285.

By contrast, in the present case Defendant is not charged with committing an offense against another Indian, but instead is charged with committing an offense "against tribal law and federal law (through the Lacey Act's incorporation of tribal law) designed to preserve fishing opportunities of Indians *and* non-Indians."  Sohappy, 770 F.2d at 819 (emphasis in original).

exempt him from the operation of the Lacey Act, a Federal statute of general applicability, the Court need not determine whether Congress explicitly abrogated that treaty right. See Wadena, 152 F.3d at 846.

While "[a] prosecution designed solely to punish a defendant for exercising a valid legal right violates due process," Leathers, 354 F.3d at 961, in the present case, Defendant has not met his burden of showing that the right he asserts—his treaty-based right to fish on the Leech Lake Indian Reservation—exempts him from the operation of the Lacey Act. Consequently, the Court recommends that Defendant's Motion to Dismiss, [Docket No. 118], be **DENIED**.

## III. DEFENDANT'S SUPPRESSION MOTIONS

### A. Facts

#### 1. Search Warrant[12]

Special Agent Patrick Lund ("SA Lund") of the U.S. Fish and Wildlife Service ("USFWS") made the application and swore out the attached Affidavit based on his own investigation as well as information he obtained in conversations with/from the investigative reports of wildlife agents representing, among others, the Minnesota Department of Natural Resources ("MDNR"), the Idaho Department of Fish and Game ("IDFG"), and the South Dakota Department of Fish, Game and Parks ("SDDFGP"). (Gov't's Ex. 2, Aff. Lund at 1, ¶¶ 1, 4). Agents investigating Operation Squarehook had reason to believe that thousands of walleye and other game fish were being taken from the Leech Lake Indian Reservation, in violation of the Leech Lake Band Conservation Code, for sale to non-Indians. (Id. at 3-4, ¶ 12). Defendant had been identified to the investigating agents as "one of the most prolific participants in this black

---

[12] The facts in this Part are derived from: **Government's Exhibit 2**: A warrant issued July 21, 2011, for the search and seizure of Defendant, and the application for and affidavit in support of said warrant; and **Government's Exhibit 3**: a "consent to search" form authorizing the search of a Ford pickup truck, signed by Defendant on July 23, 2011.

market."  (Id. at 3, ¶ 12).

As part of their investigation, IDFG Senior Conservation Officer Dwight Scudder ("SCO Scudder") and SDDFGP Special Investigator Jeff McEntee ("SI McEntee") (together, "the officers"), were working undercover.  (Id. at 4, ¶ 13).  On May 18, 2010, the officers met a restaurant owner in Bena, Minnesota, who said he could get fresh walleye "from the Indians." (Id. at 4, ¶ 15).  Two days later, on May 20, 2010, the same restaurant owner said that a man named "Otto," whom he described as "the main walleye poacher," owed him some fish.  (Id. at 4, ¶ 16).

SCO Scudder and SI McEntee met with the same restaurant owner in Bena, Minnesota, on September 24, 2010, at which time the restaurant owner told them that "Otto" was fishing in Lake Winnibigoshish on the Leech Lake Indian Reservation.  (Id. at 4, ¶ 17).  The restaurant owner said his friend "Lanny" had recently purchased fish from "Otto," and on September 26, 2010, he put the officers in touch with "Lanny," who provided the officers with a phone number for "Otto."  (Id. at 4-5, ¶¶17-18).  SA Lund, working with MDNR, determined that the phone number was registered to a Victoria Reyes of Minneapolis, Minnesota, who is a relative of Defendant.  (Id. at 5, ¶ 19).

Also on September 26, 2010, the restaurant owner phoned "Otto" and arranged for SCO Scudder and SI McEntee to purchase fish from him.  (Id. at 5, ¶ 20).  That same day, SCO Scudder received a phone call from the previously identified phone number; the caller identified himself as "Otto" and offered to meet with the officers and to sell them 200 walleye fillets for $300.00.  (Id. at 5, ¶ 21).  That same day, the officers met with Defendant, whom they recognized from photographs, at a highway intersection within the boundaries of the Leech Lake Indian Reservation, where they completed the previously described purchase.  (Id. at 5, ¶ 22).

14

Defendant described his fishing operation to the officers, and told them not to tell anyone about their purchase.  (Id.).

Two days later, Defendant—now using a different phone number[13]—phoned SCO Scudder to arrange another sale, telling SCO Scudder that he did not want to meet near the Cass Lake boat landing because of the presence of wildlife officers.  (Id. at 6, ¶ 23).  The officers instead met with Defendant at a boat landing on Pike Bay Lake, where they purchased 400 walleye fillets for $400.00.  (Id. at 6, ¶ 25).  Defendant again discussed his fishing operation, and instructed the officers to conceal the fish they had purchased.  (Id.).

Several months later, on May 29-31, 2011, SCO Scudder and SI McEntee exchanged phone calls with Defendant and arranged for the officers to purchase approximately 90 pounds of walleye fillets from him, to be shipped to Idaho, for $440.00  (Id. at 6-7, ¶¶ 27-29).

In his Affidavit in support of the search warrant applications, SA Lund describes certain electronic evidence that he intended to seize, including mobile telephones and related equipment. (Id. at 7-10, ¶¶ 32-33).

SA Lund swore out his affidavit before U.S. Magistrate Judge Jeffrey J. Keyes on July 21, 2011, and Magistrate Judge Keyes issued the search and seizure warrant the same day. Attachments to the warrant included a photograph and description of Defendant, and descriptions of the evidence to be seized, in particular, mobile phones.

## 2.  Defendant's Oral Statements[14]

At approximately 7:38 a.m. on July 23, 2011, USFWS Special Agent Steve Stoinski ("SA

---

[13] Although Defendant said that he had lost his previous mobile phone, a subsequent records search showed numerous calls placed to and from that number in October and November 2010.  (Id. at 6, ¶¶ 23-24, 26).

[14] The facts in this Part are derived from the testimony of USFWS Special Agent Steve Stoinski ("SA Stoinski"), and from **Government's Exhibit 1**: A recording of the interview that SA Stoinski and MNRD Conservation Officer Julie Olson conducted with Defendant on July 23, 2011, which the Government offered, and the Court accepted into evidence, for the purposes of this motion.

Stoinski") and MDNR Conservation Officer Julie Olson ("CO Olson") (together, "the interviewing officers") met Defendant at the intersection of County Highway 200 and County Highway 8 on the Leech Lake Indian Reservation. SCO Scudder and SI McEntee had arranged to meet Defendant to purchase fish, and the interviewing officers arrived in their stead. The interviewing officers identified themselves as law enforcement, and SA Stoinski informed Defendant that he was not under arrest, but that they needed to talk with him about illegal sales of fish. SA Stoinski asked if Defendant had any weapons, and asked him to turn off the ignition and step out of his vehicle. SA Stoinski then asked Defendant to lift his shirt so that SA Stoinski could see whether Defendant had any weapons on him.

Because it was raining, they all moved to the interviewing officers' vehicle for the interview, which was recorded. The vehicle was an unmarked vehicle, with no after-market law enforcement additions. A team of uniformed officers were in a pull-out down the road, but remained out of sight until they came to secure Defendant's vehicle, and they did not interact with Defendant at any time during his interview. The interviewing officers were armed, but did not display their weapons.

Approximately 16 minutes into the interview SA Stoinski again tells Defendant that he would not be arrested, and that he could leave any time he wanted to. Approximately 20 minutes into the interview, SA Stoinski says that he knows that a number of people are illegally selling fish, and asks Defendant why *he* is doing it, prompting the following exchange:

**Defendant**: Do I gotta answer that question?

**SA Stoinski**: Yeah, it helps me understand you better.

**Defendant**: Can I just get your card and move on?

**SA Stoinski**: I wish it were that easy for you. I know you probably just want to get the hell out of here . . . .

**Defendant**: You show me your credentials and stuff, you know . . .

**SA Stoinski**: I'll give you a card, too. No but you can't.

**Defendant**: What, are you trying to cut me a slack or a deal? Or what are you working your way up here for?

SA Stoinski then explains that he hopes Defendant will answer his questions so that he can report back that Defendant was cooperative.

Approximately 30 minutes and 40 seconds into the interview, Defendant asks if he can get out of the car to go to the bathroom. SA Stoinski said that he, too, needed a bathroom break, and both of them exited the vehicle to urinate.

Approximately 43 minutes into the interview, Defendant asks why the interviewing officers are not investigating drug use. SA Stoinski says that he is a wildlife officer, and that "if you want to make that analogy, the drug of the day is walleye fillets." Although SA Stoinski did not ask a question, Defendant responds: "If I don't answer—if I plead the Fifth here, or what?" SA Stoinski replies, "Well, you can." Defendant then says, "That's probably what I gotta do. You're gonna go and do whatever, probably take my stuff or whatever." However, Defendant continues to participate in the interview. During the next few minutes, Defendant responds to certain questions by saying that he wants to "take the Fifth" on that particular question. However, Defendant never says that he wants to end the interview.

Approximately 59 minutes into the interview, Defendant signed the "consent to search" form. Defendant stated that he wanted tribal law enforcement present, but SA Stoinski responded that federal officers had jurisdiction on the Reservation.

Approximately 1 hour and 13 minutes into the interview, Defendant asked why the officers were taking his fish. After a brief discussion, approximately 1 hour and 16 minutes into

the interview, SA Stoinski said, "Do you want to talk about this, or not? . . . OK, time out, time out. We can talk, but you said I want the Fifth. To me, that tells me you want to exercise that right. If you want to discuss this more, you have to say you want to talk to me, whether it's about . . . anything else." For several minutes, the conversation turns away from fish, with Defendant discussing his family history, and then both Defendant and SA Stoinski talking about cleaning septic systems, and Defendant talking about crime on the Reservation. Defendant remarks that the officers searching his vehicle are taking a long time, and then begins a discussion about tribal game wardens.

Approximately 1 hour and 29 minutes into the interview, SA Stoinski asks, "Are you sure you don't want to discuss this? . . . Do you want to answer these questions? Last chance." Defendant says he can't because he might put himself in danger. For several minutes, SA Stoinski and Defendant discuss matters unrelated to the investigation.

Approximately 1 hour and 42 minutes into the interview, SA Stoinski tells Defendant that the people he thought he was supposed to sell fish to were undercover officers involved in a sting operation. SA Stoinski also said that he would be talking to other targets of the investigation, and that other people might inform on Defendant, to which he responded that he would see them in court. At approximately 1 hour and 55 minutes, Defendant asked, "Why didn't you take me a long time ago?" SA Stoinski said it was just an "ongoing investigation."

Approximately 1 hour and 59 minutes into the interview, Defendant says that he is going to need witness protection. SA Stoinski responds: "You're not going to be in any witness protection program because you're not a witness—you're not telling me anything." Defendant again states that he believes he should be in witness protection, and SA Stoinski says again that he will not be a part of any witness protection program.

Approximately 2 hours and 10 minutes into the interview, SA Stoinski again broaches the subject of cooperation, asking, "Do you think you could be any worse off if you talked to me?" After a brief discussion, Defendant says, "I'm going to plead the Fifth." At approximately 2 hours and 20 minutes, SA Stoinski again states that Defendant is not going to be arrested that day. SA Stoinski again asks Defendant if he wants to talk with the interviewing officers, and Defendant says he wants to go home and think about it. Defendant asked, "Can I go?", and SA Stoinski responded that he could.

The interview took a total of about 2 hours and 44 minutes. Defendant was not arrested at the conclusion of the interview.

## B. Discussion

### 1. Defendant's Motion for Suppression of Evidence Obtained as a Result of Search and Seizure [Docket No. 93]

Defendant makes no specific argument with regard to the legality of the search warrants, but he merely asks for a four-corners review and determination of whether the search warrant was supported by probable cause.

Because the Defendant has identified no specific evidence that he believes should be suppressed, and he has offered no factual or legal grounds for suppression, the Court could recommend denying Defendant's Motion to Suppress Evidence Obtained as a Result of July 23, 2011 Search and Seizure, [Docket No. 93], solely on the basis that Defendant has failed to meet his burden of production. United States v. Jones, No. 09-cr-260 (DWF/RLE), 2009 U.S. Dist. LEXIS 112286, at *10 (D. Minn. Oct. 30, 2009) (Erickson, C.M.J.) (citing United States v. Mims, 812 F.2d 1068, 1074 (8th Cir. 1987); and United States v. Quiroz, 57 F. Supp. 2d 805, 822-23 (D. Minn. 1999)), adopted by 2009 U.S. Dist. LEXIS 112176 (D. Minn. Dec. 2, 2009) (Frank, J.). "Nonetheless, in an abundance of caution, we proceed with address[ing] the merits

of the Defendant's Motion by considering the probable cause detailed in the [w]arrant's supporting papers, and by examining for any other fatal deficiencies in the [w]arrant." Id. (citing United States v. Edwards, 563 F. Supp. 2d 977, 995 (D. Minn. 2008) (Mayeron, M.J.), adopted by 563 F. Supp. 2d 977, 984 (D. Minn. 2008) (Frank, J.).

### a. Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. The Eighth Circuit has explained that "[a]n affidavit for a search warrant need only show facts sufficient to support a finding of probable cause." United States v. Parker, 836 F.2d 1080, 1083 (8th Cir. 1987). Probable cause exists when "a practical, common-sense" evaluation of "all the circumstances set forth in the affidavit" demonstrate "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Gates, 462 U.S. at 231). "The existence of probable cause depends on whether, in the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (quoting United States v. Murphy, 69 F.3d 237, 240 (8th Cir. 1995) (quoting, in turn, Gates, 462 U.S. at 238)).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "Therefore, '[w]hen the [issuing judge] relied solely upon the

supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" <u>United States v. Wiley</u>, No. 09-cr-239 (JRT/FLN), 2009 U.S. Dist. LEXIS 116899, at *6 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting <u>Solomon</u>, 432 F.3d at 827; edits in <u>Wiley</u>). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" <u>United States v. Smith</u>, 581 F.3d 692, 694 (8th Cir. 2009) (quoting <u>United States v. Reivich</u>, 793 F.2d 957, 959 (8th Cir. 1986)). Nevertheless, "[a] magistrate's 'determination of probable cause should be paid great deference by reviewing courts,'" <u>Gates</u>, 462 U.S. at 236 (quoting <u>Spinelli v. United States</u>, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed." <u>Gates</u>, 462 U.S. at 238-39 (quoting <u>Jones v. United States</u>, 362 U.S. 257, 271 (1960)).

**b. Analysis**

Based on the information provided in the supporting affidavit, there is ample evidence to conclude that probable cause existed for the issuance of the search warrant.

The search warrant application provided extensive detail of an investigation that took place over the course of approximately one year. Specifically, the affidavit describes purchases of fish from Defendant on the Leech Lake Indian Reservation, and at least one purchase where the fish was to be shipped out of state. Based on the totality of the circumstances, and considering the deference this Court must afford Magistrate Judge Keyes's decision in issuing the warrant, this Court concludes that there was at least "'a fair probability that contraband or evidence of a crime' [would] be found" as a result of the issuance of the search warrants. <u>United States v. Velazquez-Ramos</u>, No. 11-cr-111 (MJD/FLN), 2011 U.S. Dist. LEXIS 67651, at *14

(D. Minn. Apr. 29, 2011) (Noel, M.J.) (quoting Gates, 462 U.S. at 238), adopted by 2011 U.S.

Dist. LEXIS 67588 (D. Minn. June 23, 2011) (Davis, C.J.).

Additionally, even if the Court were to conclude that there was not probable cause to

support the search warrant, the executing officers' good-faith reliance on that warrant would

militate against suppressing evidence obtained in the search.  See United States v. Leon, 468

U.S. 897, 919-21 (1984) (exclusionary rule does not apply "when an officer acting with objective

good faith has obtained a search warrant from a judge or magistrate and acted within its

scope").[15]  Defendant does not allege that any of the exceptions to the good-faith rule[16] are

applicable here; even if he did, the Court finds no support for any of these exceptions in the

present record.

Consequently, the Court recommends that the Defendant's Motion to Suppress Evidence

Obtained as a Result of Search and Seizure [Docket No. 93] be **DENIED**.[17]

## 2. Defendant's Motion for Suppression of Admissions or Confessions [Docket No. 96]

### a.  Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by

the defendant during a custodial interrogation unless the defendant has been previously advised

---

[15] See also United States v. Johnson, 219 F.3d 790, 791 (8th Cir. 2000) ("Even if we thought the warrant affidavit did not establish probable cause, the good faith exception to the warrant requirement would apply because the affidavit was sufficient to allow an officer to reasonably believe probable cause existed."); United States v. Rugh, 968 F.2d 750, 753 (8th Cir. 1992) ("When police objectively and reasonably believe that probable cause exists to conduct a search based on an issuing judge's determination of probable cause, evidence seized pursuant to the ultimately invalid search warrant need not be suppressed.").

[16] See Leon, 468 U.S. at 923 (exceptions to the good faith rule when issuing judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth," "where the issuing magistrate wholly abandoned his judicial role," or when the warrant is "so facially deficient -- i.e., in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonable presume it to be valid").

[17] Defendant raises no specific objection to, nor any evidence challenging the validity of, the "consent to search" form that was submitted by the Government as Government's Exhibit 2.  Consequently, to the extent that Defendant sought by this Motion [Docket No. 93] to suppress evidence obtained pursuant to any search or seizure authorized by his signature on that form, the Court recommends that request also be **DENIED**.

of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). However, law enforcement officers "are not required to administer Miranda warnings to everyone whom they question." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him in custody." Id.

The Eighth Circuit considers six (6) factors when determining whether a suspect is in custody:

> (1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Sanchez, 676 F.3d 627, 630 (8th Cir. 2012) (quoting United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990)). "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002). Those factors, however, are not exclusive; "[t]he analysis depends upon a review of the totality of circumstances, and '[t]he ultimate test is whether a reasonable person in that position would have felt free to end the

interview.'" Sanchez, 676 F.3d at 630-31 (quoting United States v. Aldridge, 664 F.3d 705, 711 (8th Cir. 2011)).

The ultimate determination is based on the totality of the circumstances, with none of the above factors being dispositive, and a particularly strong showing on one factor may compensate for a deficiency on another factor. Griffin, 922 F.2d at 1347. The key inquiry is whether there was a formal arrest or restraining of a defendant's movement to the degree associated with a formal arrest. Stansbury, 511 U.S. at 322. "In answering this question, we look at the totality of circumstances while keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (quoting Stansbury, 511 U.S. at 322-23), cert. denied LeBrun v. United States, 543 U.S. 1145 (2005)). The Court must examine "both the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody." Axsom, 289 F.3d at 500 (internal quotation marks omitted).

### b. Analysis

Based on the present record in this case, the totality of the circumstances indicates that Defendant was not in custody when he spoke with SA Stoinski and CO Olson on July 23, 2011. Therefore, the interviewing officers were not required to provide the Defendant with a rights warning consistent with Miranda.

Defendant argues that he was never told that he was free to go. (Def.'s Mem. Supp. Mot. Suppress [Docket No. 141], at 5). The interviewing officers advised Defendant multiple times that he was not under arrest, that he was free to leave, and that his statements were voluntary.

Specifically, the recording demonstrates that, in addition to being told several times that he was not under arrest and would not be arrested that day, Defendant was expressly told approximately 16 minutes into the interview that he could leave whenever he wanted to. The recording also demonstrates that Defendant in fact unequivocally asked to leave only once, that SA Stoinski said that he could, and that the interview terminated immediately thereafter. Thus, the first factor weighs heavily against a finding of custody. Sanchez, 676 F.3d at 631 ("The first Griffin factor weighs heavily in favor of noncustody when the officers clearly inform a suspect that [he] is free to leave or decline questioning" (citations omitted).).

The third factor also mitigates against a finding of custody because, although the interview was instigated by law enforcement, Defendant voluntarily acquiesced to questioning. While Defendant did invoke his Fifth Amendment right not to answer a few specific questions, the recording also demonstrates that, during some of the periods when the conversation strayed away from the investigation, Defendant, himself, steered the conversation back to the illegal fishing and sales at issue.

Of the three potentially mitigating factors, only the second plainly fails to mitigate against a finding of custody in this case. When Defendant asked to exit the vehicle to go to the bathroom, SA Stoinski accompanied him, rather than monitoring him from the vehicle. Thus, it might be argued that Defendant did not have "unrestrained freedom of movement."[18] However, at no time during the interview was Defendant "restrained to a degree commonly associated with arrest." Griffin, 922 F.2d at 1354; see also United States v. Mottl, 946 F.2d 1366, 1370 (8th Cir. 1991) (finding second factor weighed in favor of non-custody in part because interviewing agents "did not restrain [the defendant]'s freedom of movement to a degree associated with

---

[18] However, since the record also reflects that SA Stoinski also used the opportunity of the break in the interview to likewise go to the bathroom, the fact that he accompanied Defendant may just be coincidental.

custody or formal arrest").  Here, there is no evidence that Defendant was ever handcuffed, locked in the law enforcement vehicle, or denied any request to leave the vehicle.  Thus, the Court finds the second factor to be neutral.

In the present case, the three mitigating factors, on the whole, weigh against a finding of custody.  See Griffin, 922 F.2d at 1347 (strong showing on one factor may make up for deficiency in other factors).

Furthermore, none of the three aggravating factors weighs in favor of custody.  The fourth factor does not weigh in favor of custody, because there is no evidence that investigators engaged in strong-arm tactics or deceptive stratagems.  As in Axsom, here the officers were armed but did not display their weapons.  See Axsom, 289 F.3d at 502.  The interviewing officers also did not use any deceptive stratagems, such as the good-cop, bad-cop routine.  See United States v. Brown, 990 F.2d 397, 400 (8th Cir. 1993); United States v. Carter, 844 F.2d 368, 372 (8th Cir. 1989) ("Mutt and Jeff" technique contributed to police-dominated atmosphere (citing Miranda, 384 U.S. at 452, 455)).  Moreover, the interviewing officers "asked straightforward questions and [Defendant] gave straightforward answers," Axsom, 289 F.3d at 502 (internal quotations omitted), and they did not make any promises to Defendant.  Thus, the fourth factor does not weigh in favor of a finding of custody.

Nor does the fifth factor weigh in favor of a finding of custody, because the interview was not police dominated.  In considering this factor, courts examine such considerations as the place and length of the interview.  Griffin, 922 F.2d at 1352.  Defendant notes that he was questioned in the interviewing officers' vehicle, with the officers in close proximity.  (Def.'s Mem. Supp. Mot. Suppress at 5).  However, the fact alone that Defendant was sitting in a law enforcement vehicle is not per se evidence that the interview was police dominated.  The Eighth

Circuit, in an unpublished case, found that the environment was not police dominated where a defendant was being transported inside an Iowa State Patrol trooper's squad car. United States v. Hephner, 103 Fed. Appx. 41, 44, 48-49 (8th Cir. 2004). In both Hephner and the present case, the defendants were not handcuffed as they sat in the police vehicles. See Id. at 44. In the present case, the environment was even less police dominated than in Hephner, as the vehicle was not a marked squad car with cage mesh and other law enforcement add-ons, but instead was an unmarked, standard vehicle. Moreover, in the present case, the interview took place in the law enforcement vehicle simply to get out of the rain, and the Defendant was just a few feet from his own vehicle, while in Hephner the defendant was transported some fifteen miles away from where the initial traffic stop had occurred. 103 Fed. Appx. at 44. Additionally, the presence of the other officers searching Defendant's vehicle did not contribute to a police-dominated environment, as "the fifth indicium is whether the *questioning*, not the execution of the search warrant, was police dominated." United States v. Wallace, 323 F.3d 1109, 1113 (8th Cir. 2003) (emphasis in original); see also Axsom, 289 F.2d at 503 ("While the execution of the search warrant was certainly police dominated, the interview between the two agents and [defendant] was not") (footnote omitted). Finally, although the interview was not brief, running approximately 2 hours and 44 minutes, it was also not so lengthy as to militate a finding that it was police dominated. United States v. Czichray, 378 F.3d 822, 825, 830 (8th Cir. 2004) (interview in defendant's home lasting nearly seven hours was not custodial).[19] Thus, the fifth factor does not weigh in favor of a finding of custody.

The sixth and final factor is the easiest to resolve: Defendant *was not arrested* at the conclusion of the interview, therefore this factor does not support a finding of custody.

---

[19] See also Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) ("The fact that the questioning extended for six or seven hours is not per se unconstitutionally coercive") (citing Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (interview lasting seven-and-a-half hours not unconstitutional)).

Upon the totality of the circumstances, the Court finds that Defendant was not in custody when he spoke with SA Stoinski and CO Olson on July 23, 2011. Defendant was told that he was not under arrest, he voluntarily acquiesced to questioning, and there is no evidence that his freedom of movement was restrained. Defendant remained at all times in close proximity to his vehicle, he was not transported to a location different from where he first encountered law enforcement, and the interviewing agents used no strong-arm tactics or deceptive stratagems. The interview, although lasting a less than 3 hours, was not inordinately long or in any way otherwise police dominated. Finally, Defendant was not arrested at the end of the interview.

Given the totality of the circumstances, a reasonable person in Defendant's position would not "have felt that he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995). Moreover, the Defendant's freedom was not restrained to a degree associated with formal arrest requiring a Miranda warning. Finally, the circumstances of the interview were not so police dominated as to subvert the Defendant's free will to voluntarily participate in the interview.

Consequently, the Court recommends that the Defendant's Motion for Suppression of Admissions or Confessions, [Docket No. 96], be **DENIED**.

IV.     **CONCLUSION**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Defendant's Motion to Dismiss [Docket No. 118] be **DENIED**;

2.  Defendant's Motion for Suppression of Evidence Obtained as a Result of Search and Seizure [Docket No. 93] be **DENIED**; and

3.  Defendant's Motion for Suppression of Admissions or Confessions [Docket No. 96]

    be **DENIED**.

Dated: August 14, 2013                                    s/Leo I. Brisbois
                                                          LEO I. BRISBOIS
                                                          United States Magistrate Judge

## N O T I C E

      During the briefing period following the July 2, 2013, motions hearing, upon the requests of both Parties, this Court extended the original time for both parties to prepare and file their briefs on these Motions.  Consequently, and in light of the pending trial date of September 23, 2013, the Court now finds it must reduce the time that the parties are allowed to file, and to respond to, objections to this Report and Recommendation.

      Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by August 23, 2013**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within **seven days** of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.